

FILED

November 13, 2017

TN COURT OF
WORKERS'
COMPENSATION
CLAIMS

1:20 P.M.

## TENNESSEE BUREAU OF WORKERS' COMPENSATION
## IN THE COURT OF WORKERS' COMPENSATION CLAIMS
## AT JACKSON

| | | |
|---|---|---|
| **CHARLES REED,** | ) | **Docket No. 2016-07-0044** |
| **Employee,** | ) | |
| **v.** | ) | |
| **KELLOGG COMPANY,** | ) | **State File No. 8423-2015** |
| **Employer,** | ) | |
| **And** | ) | |
| **OLD REPUBLIC INSURANCE CO.,** | ) | **Judge Amber E. Luttrell** |
| **Insurance Carrier.** | ) | |

---

### COMPENSATION HEARING ORDER

---

This matter came before the Court on October 11, 2017, for a Compensation Hearing. The central legal issues are whether Mr. Reed established by a preponderance of the evidence that his injury arose primarily out of and in the course and scope of his employment at Kellogg Company and whether he is entitled to past temporary disability benefits, permanent partial disability, and future medical benefits. For the reasons set forth below, the Court holds that Mr. Reed did not meet his burden of proof. Thus, he is not entitled to the requested benefits.

### History of Claim

Mr. Reed worked for Kellogg Company as a lab technician. Among other duties, he transported forty to fifty-pound containers of chemicals by golf cart to satellite labs in the facility. On October 18, 2015, Mr. Reed lifted a forty-pound alcohol container off the cart and carried it into the lab to store in a lower chemical cabinet. He testified he bent down at his knees and twisted his body to push the alcohol container into the cabinet when he experienced a sharp pain in his left hip and buttock.

A coworker, Percy, heard Mr. Reed from the other side of a partial wall in the lab but did not witness the incident. Percy called Kellogg's first responder, Jamie Engle, to assist Mr. Reed. Mr. Reed testified he attempted to "walk it off," but his pain increased

1

and he requested medical treatment. Mr. Engle called an ambulance to transport him to the Jackson-Madison County General Hospital Emergency Room (ER).

Under Kellogg's policy, Mr. Engle requested Mr. Reed submit to a urine drug screen at the hospital. Mr. Reed testified he was unable to walk to the restroom to provide the sample because he was impaired from two Demerol shots administered in the ambulance and the ER; therefore, the nurse provided Mr. Reed a portable urinal to utilize at his bedside. Mr. Engle stayed in the room and assisted Mr. Reed with standing up. After Mr. Reed provided the sample, he handed it to the nurse when his left leg and hip "gave out" and he fell. Mr. Reed alleged he injured his back and left knee in the fall. However, the ER records from the visit do not document Mr. Reed's fall or any examination of him as a result of his fall. Rather, the providers x-rayed Mr. Reed's left hip, which indicated no acute fracture or dislocation, diagnosed "other sprain of left hip," and discharged him to return home with crutches.

Kellogg initially accepted Mr. Reed's claim and provided him authorized treatment with Dr. Christopher Lewis, a primary care physician, Dr. Mohammad Assaf, a neurosurgeon, and Dr. Keith Nord, an orthopedic surgeon. Mr. Reed selected these physicians from panels provided by Kellogg. Mr. Reed subsequently sought unauthorized treatment or evaluation from Dr. Gift Eze, Dr. Davidson Curwen, and Dr. James Warmbrod. The parties took the depositions of Dr. Nord and Dr. Warmbrod and introduced the following medical proof.

*Medical Treatment and Physicians' Testimony*

*Authorized Treatment*

*a. Dr. Lewis*

Mr. Reed initially saw Dr. Lewis two days after the injury. Dr. Lewis noted a history of Mr. Reed's work incident involving his left hip and noted he "slipped and made the symptoms worse while being evaluated at the hospital." Dr. Lewis diagnosed sciatica and transient weakness of the left leg. He ordered MRIs of the hip and low back and took Mr. Reed off work until further evaluation. (Ex. 8 at 201-203.) At a follow-up visit, Dr. Lewis x-rayed Mr. Reed's knee, which was normal, and referred him to a neurosurgeon for evaluation of his back.

*b. Dr. Assaf*

Mr. Reed presented to Dr. Assaf and complained of continued pain in his left knee, lower leg, and low back with pain down his left leg. Dr. Assaf examined Mr. Reed, reviewed his MRI results, and noted his left hip MRI was normal and his lumbar spine MRI indicated degenerative disc disease. Dr. Assaf diagnosed intervertebral disc

2

degeneration in the lumbar region and ordered an EMG of the left lower extremity, which indicated no radiculopathy and was normal. At a follow-up visit, Dr. Assaf did not recommend treatment and concluded, "I cannot explain his inability to walk from neuro standpoint." He referred Mr. Reed for an orthopedic consult. *Id.* at 234.

### c. Dr. Nord

Mr. Reed next saw Dr. Nord and complained of left knee pain. Dr. Nord noted no indication of a ligamentous tear or meniscal pathology on exam. His only finding on exam was some apprehension when he moved the kneecap. An x-ray showed mild tibial spurring, which he characterized as a degenerative finding. Dr. Nord noted Mr. Reed's pain was out of proportion with his findings but ordered an MRI of the knee. The MRI study was consistent with degenerative arthritis, and Dr. Nord diagnosed osteoarthritis of the left knee.

At a follow-up visit, Dr. Nord examined Mr. Reed's back. His exam findings were normal except for some tenderness at the lumbar spine. Dr. Nord reviewed Mr. Reed's lumbar MRI and noted degenerative disc disease and some minor annular tearing at L5-S1, L4-5, and L3-4. Dr. Nord prescribed a strong anti-inflammatory for Mr. Reed and instructed him to stop using crutches. He returned Mr. Reed to work full duty on February 28, 2016, and released him at maximum medical improvement on March 22, 2016. (Ex. 6 at 15.)[1] He completed a C30A form and assigned a zero-percent impairment.

Concerning causation, Dr. Nord stated in response to various letters from the parties that Mr. Reed's "lumbar [degenerative disc disease] and knee arthritis [did] not primarily arise out of his employment. They are degenerative in nature." (Ex. 8 at 25.) In his deposition, Dr. Nord testified as follows regarding his opinion.

Q: Did you feel that his back condition . . . was in any way related to or caused by—primarily caused by the work incident alleged on October 18, 2015?

A: I felt all my findings were degenerative in nature. And I felt that his actual symptoms were out of proportion to the findings. And I did not think that it was an acute injury.

Q: Okay. Is that—can we say that is another way of saying it's not related to work?

---

[1] Dr. Nord testified regarding a typographical error in his C-30A regarding the MMI date and return to full-duty work date. He testified he returned Mr. Reed to work and placed him at MMI in 2016, not 2017 as reflected in the C30A.

3

A: Yes.

In one early letter to Dr. Nord from Mr. Reed's counsel dated February 8, 2016, counsel asked if Mr. Reed's back condition arose primarily out of and in the course and scope of his employment. Dr. Nord responded to the letter stating:

> Only the L5-S1 disc. As noted, it would be highly unlikely to develop annular tears at three levels from one acute injury. It is possible that the L5-S1 disc protrusion occurred from the work injury with preexisting disc disease. I noted his symptoms are out of proportion to his findings which hurt his believability.

(Ex. 6 at 11.)

Following this response, Kellogg provided Dr. Nord with Mr. Reed's 2008 lumbar MRI reports stemming from a preexisting back injury from an auto accident for comparison and asked if "any of Mr. Reed's injuries at the L5-S1, L4-5 and L3-4 causally related to the workplace injury of October 18, 2015 to a reasonable degree of medical certainty." Dr. Nord responded, "No." (Ex. 8 at 58.) Dr. Nord testified he compared Mr. Reed's 2008 lumbar MRI to his post-injury MRI in 2015 and noted no anatomic change. He stated the MRIs were "very similar." (Ex. 6 at 19.) Dr. Nord testified he changed his opinion regarding the relatedness of the L5-S1 MRI findings after comparing the pre-injury MRI to the post-injury study.

Concerning any aggravation of Mr. Reed's preexisting condition, Dr. Nord acknowledged it was possible that Mr. Reed aggravated his preexisting back condition. *Id.* at 20. However, Dr. Nord responded as follows to Kellogg's follow-up questioning.

> Q: You answered that it was possible there could have been an aggravation. Going back to your original statement you made on direct examination, primarily, more likely than not? Possible can be vague. What's your medical opinion as to whether or not this work incident aggravated any preexisting condition that would have resulted in anatomic change?
>
> A: I felt that it did not result in 51 percent or greater changes in the knee or the back.

Kellogg took a supplemental deposition of Dr. Nord following Dr. Warmbrod's deposition. He reviewed Dr. Warmbrod's deposition transcript and stated it did not change his opinion. (Ex. 7 at 7.) Dr. Nord concluded to a reasonable degree of medical certainty that Mr. Reed's injuries were not fifty-one percent or more caused by his workplace injury. *Id.* at 11.

4

In light of Dr. Nord's causation opinion, Kellogg controverted Mr. Reed's claim on February 2, 2016, and Mr. Reed sought additional unauthorized treatment.

*Unauthorized Treatment*

*d. Drs. Eze and Curwen*

Mr. Reed saw his personal physician, Dr. Eze, who diagnosed low back pain and radiculitis and referred Mr. Reed to Dr. Curwen for therapy.

Dr. Curwen reviewed Mr. Reed's MRI and EMG testing and concluded he presented with "some degree of symptom modification." (Ex. 9.) Dr. Curwen further stated Mr. Reed's clinical evaluation and diagnostic studies suggested L5 radicular symptoms. He also diagnosed "kneecap pain" and recommended an exercise program. At follow up visits, Mr. Reed informed Dr. Curwen he had little to no pain in his back or knee as long as he wore knee and back braces.

*e. Dr. James Warmbrod*

Lastly, Mr. Reed saw Dr. Warmbrod on one occasion in August 2016 for evaluation of his knee and back. Dr. Warmbrod examined his back, reviewed his MRIs, and concluded Mr. Reed "probably had some lumbar disc disease with radiculopathy down his left lower extremity." (Ex. 5 at 12.) Dr. Warmbrod deferred to Dr. Assaf whether Mr. Reed required any further back treatment. Regarding his knee, Dr. Warmbrod noted some tenderness to the medial lateral side of the joint on exam. He noted Mr. Reed was under Dr. Curwen's care and deferred treatment recommendations to him for the knee.

Regarding causation, Dr. Warmbrod noted in a letter to Mr. Reed's counsel that he compared Mr. Reed's 2008 back MRI to the 2015 MRI. He stated, "I do not think there has been any significant anatomic change, advancement, progression of any underlying condition from 2008 to 2015." *Id.* at 27. Dr. Warmbrod further concluded in the letter, "I . . . believe that this patient's low back pain and left knee injury are causally related to the October 18, 2015 work injury. I do not think he has any specific hip injury secondary to that accident." *Id.* at 25.

In his deposition, Mr. Reed's counsel asked Dr. Warmbrod, "[W]ere you able to render an opinion as to the cause of Mr. Reed's left knee pain, left hip pain, and his low back pain?" Dr. Warmbrod responded, "Well, . . . based on . . . his record and x-rays that I thought he had a lumbar condition and I thought he would – I thought he did come out of the injury on the job." *Id.* at 14-15.

On cross-examination, Kellogg asked Dr. Warmbrod the following question:

5

Q: Okay, But outside the fact that these examinations reveal a lumbar issue or pain or the relation of pain that the patient is telling you, those examinations really don't give you the information you need to determine what caused this incident [injury] correct?

A: You'll never be a 100 percent sure, I guess.

Q: Okay.

A: But you have to take—I guess taking in the history he gives you, the examination and the MRI results, you have to form an impression and I can't–and as I think it's in one of these reports, I can't separate all this from 2008 or now you've got 2013, 2015. I can't—it's hard for me to separate them, but I still believe based on the history and the examination and x-rays, that this injury aggravated and had something to do with his present condition.

*Id.* 30. He further testified that, given his opinion that the MRIs indicated no anatomic change, advancement or progression of Mr. Reed's underlying back condition, he did not have "any physical evidence of a causal relationship on the patient the day he saw him to the October event." *Id.* at 31.

Dr. Warmbrod assigned a two-percent permanent impairment for patellofemoral arthritis in the knee and twelve-percent impairment for the back, which correlates to a combined rating of thirteen-percent to the body. (Ex. 8 at 91.)

*Hearing Testimony[2]*

Mr. Reed testified regarding a preexisting injury to his low back in 2008. He suffered a bulging disc in his low back in a motor vehicle accident. He sought treatment from a neurosurgeon and had an MRI, but did not require surgery. Mr. Reed treated conservatively for the back injury and missed four days of work. He also described a 2013 go-cart accident resulting in injuries to his head, neck, upper and mid back. He treated conservatively for this incident with a primary care physician and took a few days off work. Mr. Reed testified he recovered from both incidents.

Mr. Reed stated he attempted to return to work after Dr. Nord released him to full duty. He utilized a cane for stability at that time although no authorized physician

---

[2] Mr. Reed's sister, Idaline Reaves, and his wife, Anganette Reed, also testified at the hearing. Ms. Reaves saw Mr. Reed on the date of the accident at the hospital, confirmed he was "out of it," and drove him home from the hospital. Mrs. Reed echoed Mr. Reed's testimony regarding his difficulties at home following his injury.

prescribed any assistive devices. He presented to Kellogg at the beginning of February 2016 to discuss returning to work and met with a human resources representative and management personnel to discuss his fitness for duty. Mr. Reed stated Kellogg informed him that using a cane would be a problem. As a result of the meeting, Mr. Reed did not return to work and applied for short-term disability. Kellogg ceased temporary disability payments at that time.

As of the hearing date, Mr. Reed had not returned to work. He testified Dr. Eze had him off work. He also stated pain in his back, leg, and knee kept him from working. Mr. Reed stated his hip strain from the original incident resolved. He takes pain and nerve medication daily that makes him drowsy. He cannot stand longer than thirty minutes without back pain and stated he can sit "about two hours." He testified to "good days and bad days."

At the close of Mr. Reed's proof, Kellogg moved for Involuntary Dismissal under Tennessee Rule of Civil Procedure 41.02(2). The Court took the motion under advisement and allowed Kellogg to present its evidence. For its proof, Kellogg relied on Dr. Nord's causation opinions expressed in his two depositions. It argued Dr. Nord's opinion carries a presumption of correctness that Mr. Reed failed to rebut.

**Findings of Fact and Conclusions of Law**

Mr. Reed has the burden of proof on all essential elements of his claim. *Scott v. Integrity Staffing Solutions,* 2015 TN Wrk. Comp. App. Bd. LEXIS 24, at *6 (Aug. 18, 2015). "[A]t a compensation hearing where the injured employee has arrived at a trial on the merits, the employee must establish by a preponderance of the evidence that he or she is, in fact, entitled to the requested benefits." *Willis v. All Staff,* 2015 TN Wrk. Comp. App. Bd. LEXIS 42, at *18 (Nov. 9, 2015); *see also* Tenn. Code Ann. § 50-6-239(c)(6) (2016).

*Motion to Dismiss*

Kellogg moved for involuntary dismissal at the close of Mr. Reed's proof under Tennessee Rule of Civil Procedure 41.02(2), which provides:

> After the plaintiff in an action tried by the court without a jury has completed the presentation of plaintiff's evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.

To prove a compensable injury, Mr. Reed must show to a reasonable degree of medical certainty that his knee and back conditions arose primarily out of and in the course and scope of his employment. This requires a showing by a preponderance of the

7

evidence that his employment contributed more than fifty percent in causing the injury, considering all causes. Finally, if he contends the work injury aggravated a previous condition, he must show to a reasonable degree of medical certainty that the aggravation arose primarily out of and in the course and scope of employment. Tenn. Code Ann. § 50-6-102(14); *see also Payne v. D & D Elec.*, No. E2016-01177-SC-R3-WC, 2017 Tenn. LEXIS 215, at *9 (Tenn. Workers' Comp. Panel Apr. 18, 2017).

Kellogg argued Mr. Reed failed to prove medical causation because Dr. Warmbrod did not testify within a reasonable degree of medical certainty that his work incident contributed more than fifty percent in causing his knee and back conditions. While Dr. Warmbrod did not use specific language set forth in Tennessee Code Annotated section 50-6-102(14), Mr. Reed still argued Dr. Warmbrod established causation for the knee and back conditions and rebutted the presumption afforded Dr. Nord's opinion. The Court disagrees. Our Appeals Board held that a physician may render an opinion that meets the legal standard set forth in section 50-6-102(14) without specifically restating the statutory definition. However, sufficient proof is required from which the trial court can conclude that the statutory requirements of an injury as defined in section 50-6-102(14) are satisfied. *Panzarella v. Amazon.com, Inc.,* 2017 TN Wrk. Comp. App. Bd. LEXIS 30, at *14-15 (May 15, 2017).

Here, the Court finds Dr. Warmbrod's testimony falls short of satisfying the current standard for a compensable injury or aggravation. While Dr. Warmbrod indicated Mr. Reed's knee and back conditions are causally related his to work incident and that "this injury aggravated and had something to do with his present condition," this does not address the current legal standard for causation. The mere fact that Mr. Reed's knee and back conditions might be work-related to some unspecified degree is insufficient for the Court to find Mr. Reed's injuries constituted more than fifty percent of the cause of his current disability and need for medical treatment, *considering all causes*.

Even if Dr. Warmbrod's opinions sufficiently met the statutory requirements of an injury, the Court still finds his testimony insufficient to overcome the presumption of correctness afforded Dr. Nord's opinion. Dr. Nord thoroughly examined Mr. Reed for his knee and back complaints, ordered and reviewed MRIs, which only indicated degenerative findings, and found his symptoms were "out of proportion to the findings." Notably, Dr. Nord's opinion appeared to be shared by Dr. Assaf, who could not explain Mr. Reed's symptoms from a neurosurgical standpoint. Even Dr. Curwen, Mr. Reed's personal physician, indicated Mr. Reed presented with "some degree of symptom modification." The Court interpreted Dr. Curwen's comment to mean he also found Mr. Reed's symptoms to be out of proportion to his findings. Dr. Nord concluded to a reasonable degree of medical certainty that Mr. Reed's back and knee conditions were not fifty percent or more caused by his workplace injury. The Court finds the conflicting proof from Drs. Nord and Warmbrod amounts to a difference of opinion between the physicians, and the Court is not persuaded that the preponderance of the evidence overcomes the presumption of correctness of Dr. Nord's opinion.

Thus, this Court concludes that Mr. Reed failed to meet his burden of proving a compensable injury and grants Kellogg's motion for involuntary dismissal.

**IT IS, THEREFORE, ORDERED** as follows:

1. Mr. Reed's request for workers' compensation benefits is denied.

2. Absent an appeal of this order by either party, the order shall become final thirty days after issuance.

3. Costs of $150.00 are assessed against Kellogg under Tennessee Compilation Rules and Regulations 0800-02-21-.07 (2016), to be paid within five days of this order becoming final.

4. Kellogg shall prepare and file a statistical data form within ten business days of the date of this order under Tennessee Code Annotated section 50-6-244.

**IT IS SO ORDERED.**

**ENTERED this the 13th day of November, 2017.**

**JUDGE AMBER E. LUTTRELL**
**Court of Workers' Compensation Claims**

9

# APPENDIX

Exhibits:
1. First Report of Injury
2. Wage Statement
3. Panels (collective exhibit)
4. Notice of Controversy
5. Dr. James Warmbrod's deposition
6. Dr. Keith Nord's May 24, 2017 deposition
7. Dr. Keith Nord's June 28, 2017 deposition
8. Kellogg's Indexed medical records
9. Mr. Reed's Indexed medical records

Technical record:[3]
1. Petition for Benefit Determination
2. Dispute Certification Notice
3. Scheduling Order
4. Kellogg's Motions in Limine to Exclude The Testimony of Dr. Warmbrod
5. Kellogg's Notice of Filing Official Transcripts
6. Kellogg's Suggestion of Non-Opposition
7. Mr. Reed's Response to Motion in Limine
8. Kellogg's Reply to Employee's Response to Employer's Motion in Limine
9. Mr. Reed's Notice of Filing Official Transcript
10. Petition for Benefit Determination (post-discovery)
11. Dispute Certification Notice (post-discovery)
12. Kellogg's Notice of Filing Medical Records
13. Kellogg's Exhibit List
14. Kellogg's Witness List
15. Mr. Reed's Designation of Proposed Witnesses
16. Order Denying Employer's Motion in Limine
17. Mr. Reed's Pre-Hearing Position Statement
18. Kellogg's Pre-Hearing Position Statement
19. Mr. Reed's Exhibit List

---

[3] The Court did not consider attachments to Technical Record filings unless admitted into evidence during the Compensation Hearing. The Court considered factual statements in these filings or any attachments to them as allegations unless established by the evidence.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this Order was sent to the following recipients by the following methods of service on this the 13th day of November, 2017.

| Name | Via Email | Service sent to: |
|---|---|---|
| Marcus Reaves, Esq., Attorney for Employee | X | mreaves@wildblue.net |
| Shawn Cardwell, Esq., Attorney for Employee | X | Shawn.cardwell@leitnerfirm.com |

Penny Shrum, Court Clerk
Court of Workers' Compensation Claims

11